UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| JEAN ZURRIN,<br><br>    Petitioner,<br><br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>    Respondent. | Case No.: CV 09-095-S-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

Now pending before the Court is Jean Zurrin's Petition for Review (Docket No. 1), seeking review of the Social Security Administration's final decision to deny her claim for Title II disability benefits. This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully reviewed the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS[1]

Petitioner applied for Social Security disability benefits on May 31, 2005; she was denied initially and, again, on reconsideration. *See* Pet.'s Brief, p. 2 (Docket No. 16). Petitioner made a timely request for a hearing before an Administrative Law Judge ("ALJ"). *See id.* On

---

[1] Respondent stipulates to Petitioner's statement of the case. *See* Resp.'s Brief, p. 3 (Docket No. 17). Therefore, Petitioner's account of the action's "Procedural History" will be referenced and incorporated within this Memorandum Decision and Order.

**MEMORANDUM DECISION AND ORDER - 1**

April 18, 2007, ALJ Steven B. Berlin held a hearing in Boise, Idaho, at which time, Petitioner, represented by attorney Andrea Cardon, appeared and testified. *See id*. A vocational expert, Anne F. Aastum, also appeared and testified during the same April 18, 2007 hearing.

On September 26, 2007, the ALJ issued a decision denying Petitioner's claims, finding that Petitioner was not disabled within the meaning of the Social Security Act. *See id*. Petitioner timely requested review from the Appeals Council on November 21, 2007. *See id*. On January 23, 2009, the Appeals Council denied Petitioner's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. *See id.*

Having exhausted her administrative remedies, Petitioner timely files the instant action, arguing that "[t]he final Agency decision is not supported by substantial competent evidence and/or contains legal error." *See* Pet. for Review, p. 1 (Docket No. 1). Specifically, Petitioner asserts that (1) the ALJ failed to properly support his rejection of Petitioner's allegations of disabling pain and other symptoms; and (2) the ALJ's residual functional capacity assessment failed to accurately describe Petitioner's limitations from June 25, 1999 to the present. *See* Pet.'s Brief, pp. 7-15 (Docket No. 16). Petitioner requests that the Court reverse the ALJ's decision and order the payment of benefits or, alternatively, remand the case for proper consideration of the evidence. *See id*. at p. 14; *see also* Pet. for Review, p. 2 (Docket No. 1).

## II.  STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. 42

U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence.  *Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  The standard requires more than a scintilla but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), and "does not mean a large or considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ.  *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019.  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984), resolving ambiguities, *see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984), and drawing inferences logically flowing from the evidence, *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Where the evidence is susceptible to more than one rational interpretation in a disability proceeding, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ.  *Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error.  *Matney*, 981 F.2d at 1019.  The ALJ's

**MEMORANDUM DECISION AND ORDER - 3**

construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id*. However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## III.  DISCUSSION

### A.    Sequential Processes

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) - or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) - within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe his physical/mental impairments are and regardless of his age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner worked briefly after her alleged disability onset date but, given the nominal amount of her earnings, concluded that it did not constitute substantial gainful activity. (AR 23).

**MEMORANDUM DECISION AND ORDER - 4**

Therefore, the ALJ determined that Petitioner did not engage in substantial gainful activity from June 27, 1999 - the alleged onset date.  *Id.*[2]

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement.  20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. §§ 404.1521, 416.921.  If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that Petitioner had the following severe impairments: (secondary to an industrial accident) status post complex pelvic fracture with iliosacral screw fixation, left metatarsal fracture, degloving wound of the right lower extremity, and closed head injury with loss of consciousness and post-traumatic amnesia; depression; and (secondary to her head injury) a cognitive disorder.  (AR 23-24).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R.

---

[2] According to the ALJ, Petitioner's "earnings record shows that [she] has acquired sufficient quarters of coverage to remain insured through December 31, 2004 (hereinafter 'the date last insured').  Thus, [Petitioner] must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."  (AR 21).

**MEMORANDUM DECISION AND ORDER - 5**

Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *Id.* Here, the ALJ concluded that Petitioner's above-listed impairments, while severe, do not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. (AR 24-25).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity is sufficient for the claimant to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. §§ 404.1545, 416.945. Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965. Here, the ALJ determined that Petitioner has the residual functional capacity to perform light work with the following limitations: (1) lift/carry 20 pounds occasionally, 10 pounds frequently; (2) push/pull up to 25 pounds; (3) stand and/or walk for at least two hours in an eight-hour workday; (4) alternate sitting and standing at will; (5) no more than occasionally stoop, kneel, crawl, or squat; (6) cannot carry out detailed instructions on a sustained basis without infrequent errors; (7) cannot maintain attention and concentration for extended periods without infrequent distraction; and (8) needs a stable work environment with

**MEMORANDUM DECISION AND ORDER - 6**

few changes in duties, personnel, supervision, hours, or physical environment. (AR 25-28). In doing so, however, the ALJ further found that Petitioner is incapable of returning to her past relevant work as a flagger and horticulture worker II. (AR 28).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his/her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). If the claimant is able to do other work, he/she is not disabled; if the claimant is not able to do other work and meets the duration requirement, he/she is disabled. Here, even though the ALJ found that Petitioner was not able to perform past relevant work, the ALJ found that Petitioner maintained the ability to perform a number of light, unskilled occupations in the national economy, including assembly press operator, small products assembler, and plastic hospital products assembler. (AR 28-29).

**B.     Analysis**

Petitioner challenges the ALJ's denial of disability benefits in two separate respects. First, Petitioner argues that the ALJ did not provide clear and convincing evidence for rejecting her own testimony. *See* Pet.'s Brief, pp. 7-13 (Docket No. 16). Second, Petitioner argues that the ALJ's residual functional capacity assessment failed to accurately incorporate Petitioner's alleged limitations over time. *See id*. at pp. 13-14.

   1.     Petitioner's Credibility

Petitioner takes issue with the ALJ's challenge to her credibility, stating in no uncertain terms that "[t]he ALJ failed to properly support his negative credibility finding." *See id.* at p. 7.

**MEMORANDUM DECISION AND ORDER - 7**

The ALJ is in the best position to make such credibility determinations and, for this reason, the ALJ's credibility determinations are entitled to great weight. *See Anderson v. Sullivan*, 914 F.2d 1121, 1124 (9th Cir. 1990). In evaluating a claimant's credibility, the ALJ may consider a claimant's reputation, inconsistencies either in testimony or between testimony and conduct, daily activities, past work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the alleged symptoms. *See Light v. Social Security Admin.*, 119 F.3d 789, 791 (9th Cir. 1997). In short, "[c]redibility decisions are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). At the same time, it should be noted that, to reject a claimant's testimony, the ALJ must make specific findings stating clear and convincing reasons for doing so. *See Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

Petitioner states that "[t]he objective medical evidence clearly diagnoses medical conditions that are likely to cause pain." *See* Pet.'s Brief, p. 12 (Docket No. 16). The ALJ's decision, however, cannot be interpreted as disagreeing with such a notion; indeed, he found Petitioner to be suffering from several severe impairments that could reasonably be expected to produce the alleged symptoms. (AR 23-25). It is what the ALJ goes on to state, that Petitioner objects to, namely, that "Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 26).

During the April 18, 2007 hearing, Petitioner testified to her counsel that, on an average day, she must lie down for six hours or more during the day, stating:

> Q:   Okay. On an average day, how much time do you think you spend in the reclining position or laying down, from 9:00 to 5:00?
>
> A:   More than I am up.

**MEMORANDUM DECISION AND ORDER - 8**

>       Q:      Okay.
>
>       A:      For a total day?
>
>       Q:      From 9:00 to 5:00, during the day –
>
>       A:      From 9:00 –
>
>       Q:      – day hours
>
>       A:      I'd probably say about six hours a day I'm reclining.

(AR 450-451). Petitioner later confirmed her alleged disabling pain and apparent need to lie down, when responding to the ALJ's related, follow up question:

>       Q:      Okay. I didn't quite hear the answer, your attorney asked you
>               on a bad day[3] how much time you spend reclining and I, I
>               don't think I heard your answer.
>
>       A:      Six hours, maybe more. It varies.

(AR 452). Contrasted against other medical evidence in the record, the ALJ challenged Petitioner's credibility on the extent of her symptoms

    For example, the ALJ considered Petitioner's daily activities in his credibility analysis. (AR 27) ("Moreover, the Claimant's activities are not consistent with a complete inability to sustain work."). If a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may question that claimant's allegations. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *but see Hernandez-Devereaux v. Astrue*, 614 F. Supp. 2d 1125, 1149 (D. Or. 2009) ("[I]t is equally true that '[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits and many home

---

    [3] To be clear, Petitioner's counsel earlier questioned Petitioner about her alleged limitations on an "average day. *See supra* at pp. 8-9 (quoting (AR 450-451)).

**MEMORANDUM DECISION AND ORDER - 9**

activities are not easily transferable to what may be the more grueling environment of the workplace . . . .'" (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).  With this in mind, the ALJ pointed out that, within her self-reported "Function Report - Adult" form and elsewhere in the record, Petitioner indicated that "[s]he does laundry, vacuums, shops, cleans, and cooks for her family. . . . . In addition, she reads, crochets, does puzzles, plays computer games, and has participated in classes via the internet."  (AR 27 (citing AR 85-93; 119-127; 407)).[4]  However, it must also be stated that the record indicates that such tasks took a substantial amount of time and were not performed without pain.  (AR 454-455).  While one's ability to

---

[4] It is also worth noting here that, throughout the various "Function Report-Adult" forms completed by Petitioner (and consistent with her counsel's arguments (*see* Pet.'s Brief, p. 11 (Docket No. 16))), she regularly states that she relies on her familial support to help accomplish her daily activities.  *See e.g.*, (AR 85;87; 89) ("My husband helps me out a lot."); (AR 88) ("My husband take[s] care of bills, checking acc[ount].  He assist[s] me."); (AR 119) ("My husband helps me out remembering how long it's been s[i]nce I cleaned or chores."); (AR 120) ("I do the best I can, [my husband and children] take care of me; I was very independent and since the accident, my husband and son help me out."); (AR 121) ("I have to have my husband help a lot."); (AR 152) ("My husband helps me with meals, I wait until he gets home f[r]om work. . . . . My husband and son help me by doing a lot of things that I can't.").  Yet, she appeared to relay the somewhat opposite sentiment when discussing her situation with a treating source, Robert F. Calhoun, Ph.D.  *See, e.g.*, (AR 320) ("She states she feels overwhelmed with everything that is going on in her life.  She states that she feels overwhelmed in looking for a new vocation, in her marriage, and with feeling as though other people around her are not carrying their share of the load."); (AR 322) ("More specifically, Ms. Zurrin states that she feels she is carrying most of the load as far as taking care of her children and supporting her family.  She does not view her husband as being a good, reliable provider."); (AR 325) ("Ms. Zurrin appears to be carrying the entire load for her family, which is overwhelming to her."); (AR 326) ("Ms. Zurrin needs to make some lifestyle decisions regarding whether or not she is going to continue to tolerate being the primary provider for her family without consistent financial and parenting support from her husband."); (AR 328) ("She also reports feeling burdened by her husband and daughter as they tend to lean on her more than she feels she can tolerate."); (AR 335) ("She states she does not feel supported by her husband currently in that when she starts to discuss her feelings he ignores her."); (AR 338) ("She states that at times she becomes demoralized and frustrated when her husband and son-in-law do not contribute in the home. . . . . I also discussed with her her tendency to enable others to take advantage of her.  Finally, I encouraged her to be more assertive with her husband and son-in-law.").

**MEMORANDUM DECISION AND ORDER - 10**

efficiently complete household chores may suggest a claimant is not as disabled as he or she claims, the Court is careful to recognize that mere attempts to complete such tasks are not equally indicative of an exaggerating claimant. Such may be the case here.

Additionally, it is undisputed that, following her accident, Petitioner "expressed a desire to return to work and has tried many times to find work" (AR 27 (citing AR 81-84; 95-98; 172-198; 275)), albeit unsuccessfully. While these efforts are commendable, the Court recognizes that the ALJ may have found them to clash with a woman who testifies that, on average, she must lie down for three-quarters or more of a typical working day (*see supra* at pp. 8 & 9). Still, the Court cannot accept Petitioner's efforts to find work (her impairments notwithstanding) as amounting to a clear and convincing reason to reject her credibility. Her job searches, at times with the aid of vocational rehabilitationists, proved difficult given Petitioner's physical abilities, job availability, and geographic limitations. Most importantly, too, these job searches ultimately failed.

To his credit, the ALJ goes further, suggesting that the medical evidence over time does not appear to square up with Petitioner's allegations of what effectively amounts to a nearly complete disabling condition. For instance:

- On August 14, 2001, on referral from Erik D. Stowell, M.D., Terrence Currie, ATC, an Assessment Specialist, provided workday tolerance recommendations (4-6 hours sitting; 3-4 hours standing; and 2-4 hours walking), commenting that Petitioner could occasionally bend/stoop, squat, crouch, and kneel; and frequently crawl, climb stairs, and balance. (AR 203). Mr. Currie ultimately determined that Petitioner "show[s] the ability to return to work for 8 hours a day, working at recommended light to light-medium level at this time." (AR 204).

- On August 22, 2001, Dr. Stowell concurred with Mr. Currie's recommendations, summarizing that Petitioner "should be able to tolerate an eight hour workday with standing limited to four hours, up

**MEMORANDUM DECISION AND ORDER - 11**

> to 30 minutes continuously, walking up to 2-4 hours but only short distances at a time. . . . she should be restricted to only occasional bending, stooping, squatting, crouching or kneeling. " (AR 292).[5] Dr. Stowell also offered his thoughts on Petitioner's lifting (20 pounds above shoulders and 25 pounds chair to floor), carrying (27 pounds), and pushing/pulling (50 pounds) limitations. *See id.*

- On September 25, 2002, Lee Barton, M.Ed., C.R.C., a Vocational Expert, upon a referral from Petitioner's own attorney, Andrew Chasan, evaluated Petitioner "to determine how the injuries she received in her accident of June 25, 1999, would affect her future ability to earn wages." (AR 397). Mr. Barton reviewed the medical records from Dr. Meier, Dr. Stowell, Dr. Calhoun, and the Key Functional Capacity Assessment from Saint Alphonsus Rehabilitation Services. *See id.* Mr. Barton found that Petitioner's "physical limitations place her in the light category of work." (AR 402). On August 11, 2003, Mr. Barton "st[oo]d by [his] opinion expressed in [his] September 25, 2002 report." (AR 407).

- On January 17, 2003, following over three years of neuropsychological consultation, Dr. Calhoun discussed with vocational counselors "possible jobs that [Petitioner] could participate in." (AR 308). At that time, Dr. Calhoun "approve[d] job descriptions with her being a cashier or a hotel clerk without audit responsibilities." *See id.*[6]

---

[5] Dr. Stowell rated Petitioner's whole person permanent partial impairment at 12% (AR 292), in contrast to Mark C. Meier's, M.D., 3% whole person impairment in 2000. (AR 275). Interestingly, however, Dr. Stowell based his 12% impairment rating on "Class I skin disorder (9%), and a pelvic fracture with iliosacral involvement (3%). (AR 292). These ratings, therefore, may not be entirely inconsistent with Dr. Meier's findings. *See also infra* at n. 6, p. 12.

[6] At times, Dr. Calhoun also associated Petitioner's condition as one that may have preceded her accident. *See, e.g.*, (AR 310) ("Thus, Ms. Zurrin now has a total of eight percent attributed to the industrial accident of June 25, 1999, with the remaining 8 percent being attributed to pre-existing psychological factors."); (AR 316) ("She does qualify for a 16 percent partial-permanent impairment rating. Five percent of the 16 percent is attributed to the industrial accident of June 25, 1999. The other 11 percent is attributed to pre-existing marital, parenting, and financial stress."); (AR 325) ("These [depth of general knowledge, depth of working vocabulary, and mental arithmetic ability] weaknesses appear to be pre-existing and related to her educational background versus being related to her closed head injury."); (AR 336) ("I explained to her that I did not think that her forgetfulness was the result of her head injury."). Still, even with some of these noted, pre-existing conditions, Petitioner was not considered disabled, as that term is used within the Social Security context.

**MEMORANDUM DECISION AND ORDER - 12**

Case 1:09-cv-00095-REB Document 20 Filed 03/31/10 Page 13 of 17

- On February 18, 2005, Ward E. Dickey, M.D. found Petitioner to be similarly capable of occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking (with normal breaks) for at least 2 hours in an 8-hour workday; and sitting (with normal breaks) for about 6 hours in an 8-hour workday (AR 365). Dr. Dickey also found Petitioner to be able to occasionally climb, stoop, kneel, crouch and crawl, while frequently being able to balance. (AR 366).

Together, these records arguably combine to offer clear and convincing explanations as to why the ALJ did not find Petitioner's testimony entirely credible. However, this matter is unique; the medical providers' opinion expectations do not appear to correspond neatly with Petitioner's *actual* circumstances over time. Petitioner's (1) husband (whom the ALJ specifically found to be credible (AR 28)),[7] (2) mother-in-law,[8] (3) daughter,[9] (4) former boss,[10]

---

[7] Petitioner's husband, Brian Zurrin, testified: "Now, [Petitioner] has a hard enough time just getting up . . . because nothing gets done at the house anymore." (AR454); "It will take her all day to do breakfast dishes." (AR 455); "Mail comes in the house and I don't see it for a month. I don't know where it is. [F]inally, you dig it up under here in a cabinet or under there in a cabinet, which it never used to be that way. . . . . Everything used to be right where it's supposed to be." (*see id.*); "Well, the one [job], she had prescribed medication and she got confused on it and almost caused a bad scene, a real bad scene that could have killed a guy." (*see id.*); "I don't think she [could get to work on bad days]." (AR 457).

[8] Rosemarie Zurrin submitted a letter to the record, indicating, in part: "Since [her head injury], I've noticed she can't keep on one subject, her mind goes off on another subject a lot." (AR 159); "Also, she seems to be in a lot of pain, she doesn't tell anyone how much pain she hurts, when she tries to do a lot of things she hurts for days." (*see id.*); "Jean is not a quitter, she tries hard very hard. She goes on even though she is in quite a lot of pain." (AR 160).

[9] Petitioner's daughter, Dalene Reed, also submitted a letter to the record, indicating, in part: "I know she is in a lot more pain than she admits to." (AR 161); "I know my kids miss her a lot. She used to spend time with them and watch them for me, when I had things to do. Which came to a halt because my mom was in too much pain." (*see id.*); "I know she had a break down due to missing her grandkids, but I think she also misses how she used to be. Hard working." (*see id.*).

[10] Shauna Fry, President of G.V. Construction, Inc., also submitted a letter to the record, indicating that Petitioner "is physically unable to perform the tasks that we require for employees"; that "[s]he has tried to work in the office but is not able to sit for the long periods required"; and "is not able to stand for the long periods required." (AR 162).

**MEMORANDUM DECISION AND ORDER - 13**

and (5) close friend[11] have all commented on Petitioner's physical condition, consistently stating that Petitioner is incapable of even relatively mundane projects. Such accounts, among others, were considered by the Industrial Commission for the State of Idaho (the "Commission"), finding Petitioner to be permanently and totally disabled. (AR 196); *see also* (AR 194) ("Mr. Barton [a vocational expert (*see supra* at p. 12)] is a credible witness who, at the end of the day, had a personal stake in getting Claimant a job - his reputation. Even with his professional standing on the line, he could not find regular work for Claimant.").[12] Unfortunately, the ALJ did not devote any considerable effort toward explaining why these other materials - materials

---

[11] Petitioner's friend, Ginnie Blackman, also submitted a letter to the record, stating:

> After the accident, Jean didn't like going out. She can't do the things she used to do. She can't sit long, she can't stand long, she can't sleep long, she is always in pain. Her leg swells whenever she tries to do all the things we take for granted like housework, shopping, playing with the kids. It's things she tries to do then suffers afterwards. She can't remember things like she used to either. . . . . She wants to be the person she was before the accident but that will never happen. I don't know if she has accepted it or not, but I know she will never be the same as before.

(AR 201).

[12] It is true that there are many disability programs, both government and private, that use different rules, such that a person may be receiving benefits under another program and still not be entitled to benefits under Social Security rules. (AR 53). Regardless, the ALJ did not spend significant time reconciling the Commission's findings with his own. *See, e.g. Watson v. Astrue*, 2009 WL 2423967, *2 (E.D.N.C. 2009) ("A recent Social Security ruling states, '[W]e are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies. Therefore, evidence of a disability decisions by another governmental or nongovernmental agency cannot be ignored and must be considered.'" (citing SSR 06-03p, 2006 WL 2329939 at *6)). This is particularly important where the Commission's findings reveal that "Dr. Stowell later testified that he had overestimated Claimant's physical abilities and did not appreciate the full extent of her physical limitations at the time he had released her for the trial return to her time-of-injury job." (AR 178 & 191-192).

**MEMORANDUM DECISION AND ORDER - 14**

which seem to otherwise support (rather than jeopardize) Petitioner's credibility[13] - were discounted and/or unpersuasive.

On balance, then, the Court is struggling with concluding that the ALJ's credibility determination, while, perhaps, well-intentioned, is clear and convincing as is the standard that this Court must contrast the ALJ's decision against. The disconnect between the limited, clinical, and experiential expertise of the experts as to what *might* occur on the one hand, and what appears to be the substantiated reality on the other hand, not only challenges the ALJ's proffered clear and convincing reasons for questioning Petitioner's credibility, it seems to contradict them outright.

This is not to say that this Court conclusively finds Petitioner to be either disabled or not disabled. Relatedly, it is not for this Court to resolve the question of Petitioner's credibility; rather, it is tasked with reviewing the basis of the ALJ's decision on that issue - highlighting those areas that may call into question the decisions reached by the ALJ - and, in doing so, should not be misunderstood as substituting its own judgment for that of the ALJ's. While Petitioner may very well not be disabled, to the extent the ALJ's conclusions in that respect was based on his credibility determination (AR 27), the specific rationale offered for questioning Petitioner's credibility is not clear and convincing. The action is therefore remanded to allow

---

[13] It should also be mentioned that, elsewhere in the record, Petitioner's credibility is unquestioned. *See, e.g.*, (AR 190) ("Claimant is a credible witness. . . . . Despite the evident difficulties, it was clear that she was doing her best to answer the questions and her answers were remarkably consistent throughout the record and the hearing."); (AR 193) ("It was evident to the Referee at hearing that although Claimant is honest, conscientious, and hard-working she simply does not have the wherewithal to develop, market and engage in full-time personal attendant work . . . ."); (AR 369) ("The claimant's allegations are supported by the medical evidence. She is considered credible."); (AR 411) ("Her contact with reality is excellent, as is her veracity.").

**MEMORANDUM DECISION AND ORDER - 15**

the ALJ to revisit this discrete issue and, in turn, determine its effect, if any, on Petitioner's disability determination.[14]

### 2. The ALJ's Residual Functional Capacity Assessment

Even when assuming Petitioner's alternate argument - that "even if . . . the ALJ's residual functional capacity assessment is correct at the time of the hearing . . . there is clear evidence that [P]etitioner was not capable of full-time work at least until one year after her onset date" (*see* Pet.'s Brief, p. 13 (Docket No. 16)) - was properly before the ALJ, its resolution is not warranted at this time given the action's remand on the larger credibility and residual functional capacity assessment issues.

### IV. CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences from facts and determining credibility. *Allen*, 749 F.2d at 579; *Vincent ex. Rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642. If the evidence is susceptible to more than one rational

---

[14] To the extent Petitioner argues that the ALJ found her to be a malingerer (*see* Pet.'s Brief, pp. 7-9 (Docket No. 16), the Court disagrees. First, the ALJ made no such definitive finding; rather, the ALJ questioned Dr. Calhoun's protocol for determining that Petitioner is not malingering. (AR26) ("Dr. Calhoun opined, however, that she does not appear to be consciously malingering as much as having ongoing feelings of depression and helplessness. But, he offered no explanation for this conclusion given that the Rey 15-Item Memory Test is aimed at identifying malingering, not depression." (Citing (AR 315))); *see also* Pet.'s Reply Brief, p. 1 ("We agree that Dr. Calhoun's report does not conclude that petitioner was consciously malingering."). Second, Respondent correctly points out that, had the ALJ determined Petitioner to be a malingerer, the credibility analysis would be over based upon that finding alone. *See* Resp.'s Brief, pp. 7-8 (Docket No. 17); *see also Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003) ("The ALJ could . . . reject [claimant's] testimony only upon (1) finding evidence of malingering, or (2) expressing clear and convincing reasons for doing so.")); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" (Internal citations omitted)). Here, the ALJ proceeded with attempting to offer clear and convincing reasons for challenging Petitioner's credibility.

**MEMORANDUM DECISION AND ORDER - 16**

interpretation, one of which is the ALJ's, a reviewing court may not substitute its interpretation for that of the ALJ. *Key*, 754 F.2d at 1549.

However, the reasons given by the ALJ in support of his determination that Petitioner's complaints are not fully credible are not sufficiently clear and convincing and, therefore, not supported by substantial evidence in the record. It is for this reason that it is necessary to remand this action for further consideration by the ALJ.

## V. ORDER

Based on the foregoing, Petitioner's request for review is GRANTED. The Commissioner's decision that Petitioner's subjective complaints are not credible is not sufficiently clear and convincing; therefore, this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum Decision and Order. *See Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991).



DATED: **March 31, 2010**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 17**